May it please the court, good morning your honors, Charles Fleischman for the plaintiff, Ms. Chellino. This is an ERISA case, an ERISA disability case. There's five issues I think I want to discuss. The first one deals with the court's, the district court's application of the standard of review. The district court relied upon the doctrine in Jordan v. Northrop that as long as there's some evidence supporting the decision and the standard of review is arbitrary and capricious, the plan wins. That sense of body, that is no longer the rule when there is a structural conflict of interest. Well, let's suppose you thought you were right about that. What is our, he did understand that a body was there, but it was after the district court opinion that Jordan was specifically overruled with regard to this category of cases. But what is the consequence of that in the sense that do we have, this is all on a cold record anyway, and do we then just look at the record ourselves under the right standard, or what do we do? You can do that. The recent case that just overruled Jordan, the Montour v. Hartford insurance case, you have the record in front of you, and you can make the decision yourself. All right. But then we have this weird complication in this case about the discovery, because I've never heard of this before, but for some reason there is no transcript of the hearing at which something happened with regard to discovery. Is that at all do you know why that was? Is that the way Judge Breyer conducts status review? It's my first time in front of Judge Breyer. I didn't even know that there was no reporter there. I didn't even pay any attention to it. But there was no reporter there. And so what's, what do you think, can you be specific about what discovery you would have done and why it would have mattered, i.e., should we be sending this case back either for an order about discovery or for discovery or what? Well, first of all, I'd like to take the deposition. I'd like to know how many times they've used Dr. Kramer before. I asked them that during the administrative review, how many times they used the other doctor, Dr. what's-his-name, I'm sorry, Dr. Krams, and the other doctor, Dr. Marks, and I'd like to know how many, and the company that he works for, I think it's UDC or whatever it is, how many times the defendant has used those people in that company, I'd also like to delve into this business where they say that they know Dr. Krams, if he looks at the film, will change his mind, which seems to indicate they know pretty much, you know, they can pretty much tell him what to do. Also, the business about Dr. Krams asking for $2,100 and saying that that's exorbitant and paying it anyway for him to look at the film and then changing his report, so I'd like to delve into all of that. I do that by way of depositions and interrogatories. And then, once the discovery takes place, who then resolves the question of whether that meets MetLife against Glenn? Well, I think it would have to go back to the district court. But I think, well, there's also the mistake, there's two mistakes, there's three mistakes that I think require a reversal, that's the Jordan error, the discovery error, and also the problem with Dr. Dixit where Dr. Marks said that Dr. Dixit never performed a physical examination of Ms. Cialino when, in fact, he did. And the judge picked up on Dr. Marks' statement there, and he also fell into that same error, saying, well, and the reason Dr. Marks disregarded Dr. Dixon's report was because he thought that Dr. Dixit never did a physical examination. And then the court picked up on that and said, well, Dr. Dixit never did a physical examination when, in fact, he did. Just to backtrack a little, what is your position about discovery where there's a structural conflict? Is it that you always get it? Is that you have to make some sort of a showing? Just as a — I don't think we have any clear Ninth Circuit law on that question. Body seems to say that the district court can allow it, doesn't have to allow it. What standard should we be applying? I don't know why, as long as it's — well, a body says that you can put in new evidence going to conflict of interest, but you can't put in new evidence going to the merits of the case. In other words, you can't put in new medical records and stuff like that. But as long as the discovery is going to the issue of conflict of interest, I don't know why it should be limited. It seems to me that that is an issue that the Supreme Court has recognized in Glenn, and the Ninth Circuit has recognized in a body. And it's fair game. We ought to be able to look into this. So it's just an ordinary case, ordinary standards, ordinary discovery standards, essentially. Right. And limited to conflict of interest. I'd also like to bring up another point. I was very curious why Dr. Crames examined Ms. Cellino, then he wrote his report, and then they decided to send him the films after they realized they didn't like his report. Why didn't they — they had the films all the time. After all, they sent it to Dr. Padgett before she ever saw Dr. Crames. Why didn't they send the films to Dr. Crames when he was doing the examination? And I think the answer is, if you looked — I don't know if you looked at the films or not, but if you looked at the films, they're the most innocuous things around. I mean, she goes shopping, there's a box boy that takes the stuff out to her car and puts it in her car for her. She goes walking. She told everybody she goes walking. She goes horseback riding. That was the slowest nag I ever saw. It barely moved. She got on that — she gets on a ramp to get on to the horse. It's a very high platform. Well, you know, people with fibromyalgia have good days and bad days, and you can assume that on the bad days she's not going to go horseback riding, and on the good days she can get up on the horse. She didn't exactly jump from the ground to the back of the horse. No, no, she didn't. And she didn't put her foot in the stirrup and hike herself over or anything like that. So I think in the end they just knew if we showed Dr. Cranes these films, maybe he'll change his mind. In fact, they knew he would change his mind, and he did. Now, if we thought on this record, just on the current record, that the decision was arbitrary and capricious, then we don't need to do anything else. That's right. That's a gorgeous story. I would also like to bring out that in the Montour case, the court talks about social security. Now, I know that the argument is that she got her Social Security Award in 2000, and it wasn't until 2006, I think, that they denied the claim. So there's a lot of years in between that, and the condition when she got the Social Security Award may not be the same as when they denied the claim. But still, there's absolutely no mention in Dr. Cranes' report or in Dr. March's report or in the report of their in-house doctor, nobody mentions anything about Social Security in any of their reports. And I think either they didn't see it, or they weren't interested in it, or it meant absolutely nothing to them, or they didn't think it was worth consideration. If there are no other questions, I'd like to reserve the rest of my time for rebuttal. Thank you. You may. Thank you. Good morning, Your Honors. Rebecca Hull, representing the accolades, and I must say, as an ERISA practitioner for several decades now, it certainly is a dynamic area of law. It never is the same. I have associates tell me it's boring. I tell them it couldn't be less boring, because it's always different, and it's always changing. And this case, I think, is a good illustration of that, because quite a few developments, obviously, occurred not only after the point when the claim determination was made, but actually even after the district court's decision, there have been new cases. However ---- So you're going to tell us that you're going to reconsider, and we should just send it back to you? Well, I suppose that certainly would be one approach to it. Because you're going to change your mind. I'm sorry? Because the agency ---- because your client is ready to change his mind? I couldn't make a representation like that to the Court. But what I would like to point out is that, to a large extent, I think that the perceived issues regarding new case law are not, in fact, serious issues in this case. Because if you look at the district court's opinion, the actual discussion, the actual analysis, even though the standard is cited as being the standard in Jordan, which the panel has already noted, was not expressly abrogated until about three weeks ago by Montour, even if you consider that, there are some or a number of Ninth Circuit cases since then that continued to cite to Jordan or to Boyd the other case that Montour disapproved, but tempered with skepticism per abeti. And that is essentially what the district court did here. If you read the district court's opinion, the district court starts off by saying, well, I'm going to ---- you know, we need to look and see whether there's a reasonable basis for this decision, but then it goes on to explain all the different specific things that it's looking for. It recognizes the applicability of abeti and the abeti standard. It ---- the opinion goes on to talk about perhaps there's a reason to have skepticism here, perhaps, as the plaintiff says, plaintiff below, a great deal of skepticism, and then goes through and explains why the district court finds that not to be the case in this situation. And, in fact, there's an uncanny parallel to Montour here because Aetna did all the things that Hartford did not, in fact, do. It got an IME. It got a functional capacity evaluation. It had constant communication with her doctors. It shared very, very freely all the information that was generated. There was a lot of back and forth as they tracked her progress and her improvement, which her own doctor said she did, over a period of about four years. Okay. What do we do with this discovery question? First of all, what is your view of the standard for discovery now in an ERISA case? And, second of all, what do we do with the fact that we really don't know what the district court decided about discovery? I think we do know what the district court decided because, well, first of all, to answer Your Honor's first question, first, the standard is what Abatey says it is. The district court has discretion to allow extra record evidence on the issue of conflict of interest. There is nothing that says that the district court must do that. It's committed to the court's discretion. There's nothing in the showing this case to this court. Counsel, if a judge starts out with the wrong premise as to what the standard is, are we supposed to be engaging in mind-reading as to what the judge would have done if the judge had started with the right standard? Is that how it works out here? You know, in the remote precincts from which I emanate, that's not how they treat us, I'll tell you. Well, perhaps they should, Your Honor. I assume that Your Honor is going back to the earlier question of what happens with the fact that the court decided to broaden. Excuse me, they're related. Because he, insofar as we have any idea what he said about discovery, he apparently said something like, well, 80 to 90 percent of the cases go off on the record. And presumably that's at least in part because he's understanding the standard to be the Jordan standard. And if that isn't true, in other words, if in a heightened scrutiny situation it isn't a Jordan standard, then presumably there would be a reason to know more about the background. I don't have the impression that he thought that at all. I can tell you that if you look in the record, you will find that both parties briefed Avedi what it meant, what it didn't mean, and so on, to the court in the context of these, this motion. They gave rise to the opinion that we're now here talking about. So it's not as though the district court was unaware of it. And in fact, the district court's own opinion discusses Avedi on several points. And recognizes its application and recognizes the potential for applying a skeptical standard of review. Kagan. But what would be the reason, just to step back for a minute, for not having the usual discovery standards apply to the question of the nature of the conflict, where the nature of the conflict matters? What would be the rationale for that? By the usual standard, I assume you mean that any plaintiff can freely non-discovery? Well, with control by the district court. And a district court can disallow things as excessive and unnecessary and not relevant. So that, for example, I mean, he's given us now some specific things he wants. And the district judge could decide whether they were relevant or not relevant to the, if you challenge them as not relevant, to the particular issue that was at issue. But why should it be a different standard? Where would that come from? Well, I think that, in a sense, it is a determination by the district court as to what the district court would ever permit to be admitted once a party describes what they want to do. And that's typically the way it happens. But that didn't happen here. No, apparently it didn't, except that it was, in fact, discussed in the summary And if the court feels it needs more information about these doctors and so on, then I would like to do discovery before the court rules. Well, suppose they did discovery and they found out that Dr. Crams had given opinions to the, to Aetna 20 times. And the opinion was always that the client was not, that the applicant was not disabled. That wouldn't be relevant? The district court's opinion actually addresses that argument by Ms. Cholino and points out that, in fact, Dr. Crams agreed that she was disabled, even though he couldn't find anything really wrong. His initial opinion was, I don't see anything that would account for this, but she's telling me she can't work. So based on that, okay, I'll say she can't work. And it was only after he saw with his own eyes snippets of her actual day-to-day life that he concluded that he had been wrong the first time. So I think it's one of those a picture's worth a thousand words or, you know, what you say doesn't match what you do is the problem, because he was very specific the second time and said, well, now that I've seen this, this doesn't match up with what she told me at all. Except that it does, in fact. It specifically matches up with everything she told him. Because she told him about the horseback riding. She told him about the walking. And she told him she could carry things that, a pound or two. The only thing she's carrying in that picture is what looks like a plastic bucket. It probably doesn't weigh a pound or 50, you know, half a pound. I don't know what that bucket was made of, and I don't know what it weighed. Well, you can tell by looking at it what it was made of. It was not made. It was plainly a plastic bucket. I assume the Court also observed her dragging open heavy gates to pastures, leading horses in and so on? Somebody describes her as pulling a horse. My understanding is that horses walk. They don't get pulled. All right. Well, I had a horse when I was young, and believe me, it took a lot of pulling to get it to do anything. Also a lot of kicking. That horse wasn't kicking. No, no. Hands on the horse. No, no. I was doing the kicking to make it move. So it didn't. I mean, it was rather an exaggeration, because she was quite forthcoming. See, that's what's unusual about this. I mean, she told them about the horses. She told them about the walking. She told them about the driving. You know, there was nothing that no kind of activity that she did that she hadn't mentioned before. Well, I think that there can be a big difference in how one says something and what one is observed doing. If I say I walk, okay, I told you I walk, it makes a big difference if you see a video of me and I'm riding along or I'm shuffling. She had her hands in her pocket almost all the time with what she said. I'm just saying hypothetically, I don't know what she said to him in that exam. Well, she said I walk with my hands in my pocket, and she did walk with her hands in her pocket. I don't know what she literally said or her intonation or anything. All I can say is he got a very different take on her situation when he could see what she was doing when she didn't think she was observed versus what she told him when she knew she was there to try to get her claim continued. So, I mean, I don't know the answer to that. All I know is that he exercised his medical expertise to say I am observing someone who previously gave me a history. Now I'm looking at this person in her natural setting, observing what she actually does, and I find it to be inconsistent. For a price. Well, if he'd been willing to do it pro bono, Your Honor, they would have said that was an exhibition of bias because why else would he do it for free? I mean, you have to pay experts to do things like this. I can certainly understand why they didn't send it to somebody else and say you look at this and tell us what you think, because the whole idea is let's make sure that this guy has all the information that's relevant to this. I think it's very instructive that listening to her describe things comes to one conclusion, and when he sees what's going on, he comes to a different conclusion. I find that compelling. Why do you think that we – you say we know what happened with regard to discovery. I don't know how you can – because of the motion, because of the statement in the summary judgment papers, is that why? Yes, because we know that the judge knew that the plaintiff wanted to do discovery and the judge did not say I find it necessary or I would admit the type of document that you want to – So therefore, we can proceed on the basis that the judge denied all discovery. That's what you're saying. That there's no ambiguity about that. The judge refused to allow any discovery. That's what you're saying. Not – That's the only thing that could be clear. If there was some opening, we certainly don't know what was. What I'm saying is that there was a half-hearted attempt at a Rule 56 application for a continuance to permit discovery, and the Court did not say yes, okay, fine, I'll defer my decision until you do discovery. Now, that may be because the plaintiff didn't make the kind of showing that one would necessarily or normally would make to get that kind of a continuance to permit discovery, because there really wasn't any explanation as to what was supposed to happen. Does the Court have further questions that I can answer? I don't think so. All right. Then I'm happy to submit. I will observe, however, that there actually are quite a few cases, in my recollection, in which where it is found that a district court has, for instance, applied the wrong standard in deciding an ERISA claim, the appropriate remedy is not for the appellate court to try to decide it for the district court, but to send it back with instructions. Well, why would that be when – I can understand that that would be true if we thought that discovery should be allowed, but if we didn't think discovery is necessary, then it's all on a cold record, and it's essentially a summary judgment. Why send it back? Well, because the district judge did not just say, you win, you lose. He did, in fact, in weighing these factors, whether he called it that or not, come to the conclusion that not only was the result of the claim decision consistent with the record, he said it was not against the great weight of the record or even against the weight of the record. So he was making some pretty specific determinations. Now, query whether in what was technically a summary judgment motion he should have done that, although where it's cross motions, maybe that's different because then effectively everyone is saying there are no issues that require an actual resolution. But the law has changed. It has and it hasn't. I'm not sure that if you have a district judge saying, I find that this result is consistent with the weight of the evidence, that would support a de novo review. In fact, I'm sorry, he didn't say. I'm just going to decide it de novo, because if he'd said that that was his standard and made that finding, we wouldn't be having this discussion, I don't think, because then it would have to be that it was clearly erroneous. Were there cross motions for summary judgment? Yes, there were cross motions, Your Honor. But that isn't what we had. That's the problem. I understand, Your Honor. So therefore, I don't see why we don't just do it. What is the point of sending it back, unless we think we need more facts? Because routinely on summary judgment, it's a de novo review, and if the judge applies the wrong standard, then we just do it. We don't send it back. There's no point to it. All right. Well, if the Court is going to do it, then I think that the Court absolutely should uphold this determination, because it was not an abuse of discretion under any standard, under the standard as it is this week or last week or last month or last year. It was consistent with the record. The judge is correct that it is consistent with the weight of the evidence, not to mention the great weight of the evidence. It is not an abuse of discretion. Okay. Thank you, Brenda. Thank you. You have used your time, ma'am. Thank you. Are there any further questions? No, please. All right. Thank you. The case just argued is submitted for decision. That concludes the Court's calendar for this morning. The Court stands adjourned. All rise. This Court for this session stands adjourned. Thank you.
judges: Shadur, Schroeder, Berzon